**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

|  |  |  |
|---|---|---|
| **APRIL WALKER** | : | **CASE NO. 3:13-cv-356** |
|  | : |  |
| Plaintiff, | : | **JUDGE THOMAS M. ROSE** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **JP MORGAN CHASE BANK, N.A.** | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

---

**ENTRY AND ORDER GRANTING IN PART AND OVERRULING IN PART JPMORGAN'S MOTION FOR SUMMARY JUDGMENT (Doc. #43) AND OVERRULING WALKER'S MOTION TO STRIKE (Doc. #50) AS MOOT**

---

Now before the Court is Defendant JPMorgan Chase Bank, N.A.'s ("JPMorgan's," or, sometimes referred to in the evidence as "Chase's") Motion for Summary Judgment. (Doc. 143.) Therein, JPMorgan asserts that it should be granted summary judgment on both Counts of Plaintiff April Walker's ("Walker's") Complaint because she was fired for engaging in fraudulent activity and not for Family Medical Leave Act ("FMLA") retaliation or due to gender discrimination, as the Complaint alleges.

Walker brings two (2) claims against JPMorgan. Count One is for FMLA retaliation in violation of 29 U.S.C. § 2615. Count Two is for gender discrimination in violation of Ohio law, O.R.C. Chapter 4112.

Walker's FMLA claim is before the Court as a statutory claim under federal law, pursuant to 29 U.S.C. § 2617. This Court has supplemental jurisdiction over the claim arising

from O.R.C. Chapter 4112 because the two claims are so related that they form part of the same case or controversy. 28 U.S.C. § 1367.

A Factual Background will first be set forth. This will be followed by the Relevant Legal Standards and an Analysis of JPMorgan's Motion.

## FACTUAL BACKGROUND

This Factual Background sets forth a summary of the facts considered for adjudication of JPMorgan's Motion for Summary Judgment. A court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, not all "facts" alleged by a Party are considered. For example, bald self-serving and conclusory allegations may not be considered. *Evans v. Jay Instrument and Specialty Co.*, 889 F. Supp. 302, 310 (S.D. Ohio 1995)(citing Anderson, 477 U.S. at 248). Also, evidence that is not admissible in a trial is not considered. *See Basinger v. CSX Transportation, Inc.*, No. 94-3908, 1996 WL 400182 at *6 (6th Cir. July 16, 1996).

Also, JPMorgan's Reply Brief is replete with argument regarding Rule 56 evidence, including Reply Exhibit 4 which is addressed below. Regardless of the deposition-taking and pleading by Counsel for both Parties, the Court is fully capable of deciding which Rule 56 evidence to use and declines to take the time to address the evidentiary arguments presented. The following Rule 56 evidence was gleaned by the Court from the more than 1800 pages of depositions and exhibits submitted by the Parties.

### Walker's Work History at JPMorgan

Walker (formerly "April Nabors") was rehired by JPMorgan as a Relationship Banker at JPMorgan's Beavercreek Branch in 2006. (Deposition of April Walker ("Walker 8/7/14 Dep.")

68, Aug. 7, 2014.) Walker's supervisor at the time was Branch Manager Tina Minnix. (Id.) Her job duties at the time included meeting with clients, opening checking and savings accounts and meeting goals. (Id.)

Walker had previously been employed by JPMorgan from May of 2001 to June of 2002. (Id. Ex. 4.) Walker's current employment at JPMorgan was at-will. (Id. at 66.)

In September of 2009, Walker entered into JPMorgan's Branch Manager Training Program. (Id. at 76.) She trained in various branches in Ohio including those at Tipp City, Beavercreek and Kettering. (Id. at 77.) Her goal was to be a District Manager and being a Branch Manager was in that career path. (Id. at 77.)

Walker became the Branch Manager at JPMorgan's branch in Eaton, Ohio beginning on September 16, 2010. (Id. at 80.) As Branch Manager, Walker worked to meet certain branch goals for checking accounts, credit cards and other similar bank accounts and products. (Id. at 165.) Walker's Supervisor at the Eaton branch was Timothy Speight. (Id. at 81.)

There is no Rule 56 evidence of any negative performance appraisals or of any past discipline of Walker. There is also some indication in the record that Walker may have received incentive payments from JPMorgan. (Deposition of John Anzalone ("Anzalone Dep.") 228-29 Ex. P Aug. 13, 2014.) Walker's employment was terminated on October 17, 2011. (Id. at 176.)

### **Walker's Supervisors**

Transitions occurred among the individuals supervising Walker in mid-2011. Until early May of 2011 and prior to Walker taking FMLA leave, Timothy Speight was the District Manager supervising Walker and the Eaton Branch where Walker was the Branch Manager. (Deposition of Chad Borton ("Borton Dep.") 32 Dec. 17, 2014.) In early May of 2011, Timothy Speight left JPMorgan and Chad Borton, as acting District Manager, became Walker's supervisor. (Id. at 32-

33.) During Walker's FMLA leave, John Anzalone ("Anzalone") became the District Manager and, thus, Walker's supervisor. (Id. at 44.) John Anzalone was the acting Branch Manager over the Eaton Branch in Walker's absence. (Id.) Finally, Anzalone had been counseled about alleged comments regarding pregnancy leave made to an employee and had been given written discipline regarding other comments made to a different employee. (Niswonger Dep. 73-76, Ex. OO.)

At the time Anzalone became District Manager and Walker was on FMLA leave, Walker had never met Anzalone. (Walker 8/7/14 Dep. at 123.) When Walker returned from FMLA leave, Anzalone became Walker's direct supervisor. (Borton Dep. at 44.) In early October of 2011, Borton transitioned out of the Mid-Ohio Market and was replaced by Cliff Hemmert ("Hemmert"). (Id. at 12.)

During her FMLA leave, Walker contacted Borton and Anzalone on one or two occasions. (Walker 8/7/14 Dep. at 119-22, 127.) Walker testified that she called Borton regarding personnel changes at the Eaton Branch and that Borton told her, "[w]hile you are on leave, I will not be discussing anything with you….) (Id. at 121.) Borton testified that he was just "following the rules" and that, from an HR perspective, when someone is out on medical leave, you do not interact with them. (Borton Dep. 81-82.) Walker also texted Anzalone regarding a replacement banker and was told, "per Chad Borton, I will not be discussing anything to do with the branch while you are on leave." (Walker 8/7/14 Dep. 122.)

Walker also stopped by the Eaton Branch during her FMLA leave at a time when she knew Anzalone was visiting the Eaton Branch because she wanted "to meet him and let him see me and have a face to the name." (Id. at 124-25.)  At the time, Anzalone was in the Eaton Branch with Justin Kozuszek ("Kozuszek"), a Branch Manager in training who was serving as the interim Eaton Branch Manager. (Id. at 125.)

Walker asked Kozuszek where he was going to be placed. (Id.) Kozuszek, according to Walker, responded that he had no idea and Anzalone said that "we" have a spot that we are looking at for you. (Id.) Walker felt like JPMorgan had already decided that Kozuszek would replace her. (Id. at 125-26.) In fact, Kozuszek became Branch Manager of the Eaton Branch after Walker was terminated. (Anzalone Dep. 23.)

Walker then called Donna Willis ("Willis") who, according to Walker, said, "they are not allowed to reach out to you. However, you are allowed to reach out to them and ask." (Walker 8/7/14 Dep. 122.) Willis also, according to Walker, said that she found that the response Walker was given by Borton and Anzalone a bit extreme. (Id.)

Walker also talked to Chad Borton sometime around July 2011 when her FMLA leave had been extended. (Id. at 127.) She told Chad Borton that she would be out for a "bit more period of time." (Id.) Chad Borton then expressed that he was looking for Walker to return sooner. (Id.) Walker then asked if her job was in jeopardy. (Id.) Chad Borton responded, "I'm not saying that your job is in jeopardy. I'm simply stating that I would like you to return sooner." (Id.)

After Walker returned from FMLA leave, she again spoke with Willis. (Id. at 135.) Walker testified that she then told Willis that Borton and Anzalone were trying to eliminate her from her job. (Id. at 135-37.) Walker also testified that she told Willis that, in her first meeting with Anzalone after returning to work, he criticized her in a "combative" way because she had contacted him via text message while she was on leave. (Id.) Finally, Walker testified that she told Willis that, during her FMLA leave, Borton had asked one of her Eaton Branch employees about Walker's mental state and whether her divorce was affecting her job. (Id. at 143-45.)

**JPMorgan's Code of Conduct**

Each year Walker read JPMorgan's Code of Conduct and affirmed that she had read, understood and was in compliance with its provisions. (Id. at 86-89.) JPMorgan had at least two (2) codes of conduct in effect during the relevant time period. One was the February 2008 Code of Conduct and the other was the April 2011 Code of Conduct. (Id. 89-93, Ex. 10, Ex. 11.) Both versions of the Code require an employee to promptly report any known or suspected violation of the Code, any internal firm policy, or any law or regulation. (Id. Ex. 10, Ex. 11.) Walker understood that violating the Code of Conduct could result in the termination of her employment. (Id. at 92.)

**FMLA Leave**

Walker took FMLA leave from June 29, 2008, through September 11, 2008, for maternity. (Walker 8/7/14 Dep. 96.) She had no problems taking this FMLA leave and had no problems returning to work from it. (Id. at 96-97.)

Walker again took FMLA leave in 2011. (Id. at 97.) She was going through a "very traumatic" divorce and contacted Donna Willis in HR to see about taking two weeks of vacation. (Id.) Donna Willis referred Walker to Dr. David L. Hayes, a physician consultant in JPMorgan's Employee Assistance Program department. (Walker 8/7/14 Dep. 98; Deposition of Cherie Niswonger ("Niswonger Dep.) 20 Nov. 11, 2014.) Following a telephone discussion between Walker and Dr. Hayes, Dr. Hayes recommended that Walker take FMLA leave instead of taking two weeks of vacation. (Walker 8/7/14 Dep. 99.)

Before taking this leave, Walker also talked to Chad Borton ("Borton") over the telephone. (Id. at 102-03.) At the time, Borton was Walker's Market Manager and Acting District Manager. (Id.)

Walker explained Dr. Hayes' recommendation to Borton. (Id. at 104.) According to Walker, Borton responded, "that I was a strong girl and that I could take my two weeks, but it really wasn't necessary for me to take the FMLA leave." (Id.) Borton remembers the phone call but denies making this statement. (Borton Dep. 78-79.) Walker acknowledged that she was granted the FMLA leave, and that nothing that Borton said or did had any impact on the taking of the leave. (Walker 8/7/14 Dep. 110.)

Walker returned to work from this FMLA leave on August 15, 2011. (Id. at 118.) Walker testified that no one stopped her from returning to work. (Id. at 120.)

### The Student Loan Application and the Proceeds Therefrom

JPMorgan received a Private Education Loan Application ("Student Loan Application") from an individual named Chad Nabors. (Id. Ex. 21.) Chad Nabors was Walker's brother-in-law at the time. (Id. 153.)

The Parties have identified two different versions of the Student Loan Application. Version 1 is Exhibit 21 to the Walker 8/17/14 Dep. and is Bates stamped JPMC00139 through JPMC11145. Another copy of Version 1 is Exhibit 6 to JPMorgan's Motion for Summary Judgment. It is Bates stamped JPMC00020 through JPMC 00026. Version 2 is Exhibit 8 to JPMorgan's Motion for Summary Judgment. It is Bates stamped JPMC22230 through JPMC00036. Another partial copy of Version 2 is Exhibit 7 to JPMorgan's Motion for Summary Judgment. It is Bates stamped JPMC00027 through 00029. The only difference between Version 1 and Version 2 is Version 1 indicates that the dates for the academic period are 08/2008 to 06/2009 and the same set of dates for the academic period on Version 2 are handwritten over the dates in Version 1 to read 09/2008 to 12/2008.

Chad P. Nabors is identified on the Student Loan Application as the borrower. The permanent street address given for the previous two years and three months is 643 Hudson Valley Ct, Fairborn, OH 45324. The email address listed belonged to Walker, but Walker testified that she never gave Chad Nabors access to her email account for accessing this Student Loan Application. (See Walker 8/7/14 Dep.  161.).

Finally, a loan in the amount of $15,500 is requested. Good Nabors Production is identified as the current employer and April Nabors is identified as a reference.

The Student Loan Application is purported to be signed by Chad Nabors. It is dated July 28, 2008. Above the signature line, the Student Loan Application indicates that, "By signing below, both the borrower and consigner agree to the terms of the "Private Education Loan Application/Promissory Note and Credit Agreement…."

The Private Education Loan Application/Promissory Note and Credit Agreement, which has a signature purported to be Chad P. Nabors on July 28, 2008, includes a certification that, "…the proceeds of this loan will be used by the student borrower for qualified educational related expenses as defined under Internal Revenue Code of 1986, as amended, at the school named, and for the loan period stated, on this Agreement. The school named in the Agreement is Wright State University, the loan period is 08/2008 to 06/2009, and the loan amount is $15,500. (Affidavit of Jeffery A. May ("May Aff.") verifying Private Education Loan Application/Promissory Note and Credit Agreement attached to JPMorgan Motion for Summary Judgment as Ex. 10, Feb. 5, 2015.)

Walker testified that she deposited the $15,500 proceeds from the Student Loan in her personal checking account. (Walker 8/7/14 Dep. 266.) She testified that Chad Nabors gave this money to her husband who then gave it to her for use to pay family bills. (Id. at 257-58, 266.)

Finally, Walker testified that she knew that the student loan proceeds that she deposited in her account were not used to support Chad Nabors or his educational endeavors. (Id. at 259.)

### Use of Credit Card

Walker testified that she used a credit card belonging to Chad Nabors. (Id. at 262.) She testified that Chad Nabors gave her the credit card and permission to use it but that she was not an authorized user on the card. (Id.) Walker also testified that she signed her name when using the card and that she made payments on the credit card account. (Id. at 263.) Kelly O'Reilly ("O'Reilly"), JPMorgan's Global Security and Investigations ("GS&I") Manager, testified that Walker told him that she used Chad Nabor's credit card because she could not qualify for a credit card. (Deposition of Kelly O'Reilly ("O'Reilly 10/9/14 Dep.) 168 Oct. 9, 2014.)

### The Complaint and Subsequent Investigation

In August of 2011, while Walker was on FMLA leave, Chad Nabors make a complaint to JPMorgan that Walker, his brother's ex-wife, obtained a Chase student loan and a Chase credit card without his knowledge. (O'Reilly 10/9/14 Dep. 71-72.) According to the individual receiving the complaint, Chad Nabors stated that he used to live with his brother and Walker at 643 Hidden Valley Ct. in Fairborn. (Id.) He also stated that Walker approached him years ago and asked if she could open a Chase checking/savings account in his name so that she could meet a certain quota for her branch, and he agreed, which is how Walker obtained his personal information. (Id.) In a letter to Chase Student Loans dated September 9, 2011, Chad Nabors wrote that, "April admitted to me around July 2010 that she had forged my name on student loan applications." (O'Reilly 10/9/14 Dep. 78-79; Anzalone Dep. Ex. J.)

Chad Nabor's complaint was referred to O'Reilly in JPMorgan's GS&I Department for further investigation. (O'Reilly 10/9/14 Dep. 27-28.) O'Reilly obtained additional documents

from the Student Loan and Fraud Department which included documentation from counsel and a police report. (Id. at 27.) O'Reilly then talked with Chad Nabors and a Beavercreek Police Department detective. (Id. at 28-29.) According to O'Reilly's testimony, the Beavercreek detective expressed some concerns over whether Chad Nabors and his brother Shannon were being totally truthful. (Id. at 36.)

O'Reilly admitted at his deposition that, as of the date of Walker's termination, he still did not know if Chad Nabors had filed a false police report. (Id. at Dep. 174.) Further, O'Reilly did not know at the time of his deposition whether Chad Nabors had filed a false police report. (Id. at 179.) Finally, O'Reilly does not remember whether he expressed his doubts about the possibility of a false police report to the decisionmakers at JPMorgan. (Id. at 179-181.)

O'Reilly then investigated the check from the student loan at issue and verified the flow of funds from bank records. (Id. at 29.) O'Reilly next contacted Anzalone, Walker's supervisor, and scheduled and conducted a telephone interview with Walker. (Id. at 29-30.)

Walker was aware that Chad Nabors had filed a complaint against her before she was contacted by GS&I. (Walker 8/7/14 Dep. 153-544.) An investigator from the Beavercreek Police Department had called her the week prior to O'Reilly's phone call. (Id. at 154.) Walker did not notify anyone at JPMorgan at the time. (Id.)

O'Reilly interviewed Walker by telephone on September 19, 2011. (O'Reilly 10/9/14 Dep. 153, Ex. V.) He told Walker that he had received a complaint from Chad Nabors and asked for the details as to what happened and the background in regards to the circumstances. (Walker 8/7/14 Dep. 155.) Walker explained that she was going through a really bad divorce, that the loan was three years prior and that the complaint was made because she had taken visitation rights away from Chad Nabor's brother Shannon Nabors, who was her ex-husband. (Id. at 155-56.)

Walker also informed O'Reilly of other instances where Chad Nabors and Shannon Nabors had lied. (Id. at 156.) Walker testified that, at the end of this conversation, O'Reilly said that it sounded like he needed to be investigating Chad Nabors and Shannon Nabors and referred to them as "bozos." (Id.) Finally, O'Reilly told Walker that he would be emailing her a written statement to be completed. (Id.)

Walker provided a written statement. (Id.) The statement is dated September 19, 2011. (O'Reilly 10/9/14 Dep. Ex. U.) In this written statement, Walker said she had nothing to do with the student loan process and that Chad Nabors took it out on his own to financially assist his brother, Shannon Nabors. (Id.) Chad Nabors gave the loan proceeds in the form of a check to his brother Shannon Nabors who then gave it to Walker to pay the bills for the home. (Id.) Regarding the credit card, Walker said that Chad Nabors gave the credit card to his brother and said it could be used for groceries and anything else needed. (Id.) Walker further said that she had permission to use the credit card and made payments on it until Shannon Nabors told her that he would begin making the payments in lieu of paying her child support because Walker and Shannon Nabors were separated. (Id.) In December of 2010 or January of 2011, Shannon and Chad Nabors' father and Shannon Nabors visited Walker and told her and her parents that they wanted Walker to pay half the student loan and credit card payments. (Id.) She declined for various reasons. (Id.) The telephone conversation and the written statement were the only things Walker provided to O'Reilly. (Walker 8/7/14 Dep. 175.)

After the interview, O'Reilly needed to validate statements made by Walker. (O'Reilly 10/9/14 Dep. 164.) He conducted a Lexis-Nexis search of Walker's residential history. (Id. at 115, Ex. S.) This search showed that Walker purportedly lived at the 643 Hidden Valley Ct. address

from February 2006 to October 2006. (Id.) The search also showed that Chad Nabors lived at that address but at different times. (Id. at 116.)

O'Reilly reviewed both the student loan customer service log and the credit card invoices. (Id. at 92-93, 105-07, Ex. R, Ex. I.) The customer service log indicates that Chase sent letters to Chad Nabors about his student loan beginning around September 30, 2008, and continuing every three (3) months until at least March of 2011. (Id.) The log also indicates that a letter sent on December 31, 2008, was emailed to Chad Nabor's student email address at Wright State University. (Id.) Also, Chase mailed monthly credit card invoices to Chad Nabors at the 843 Hidden Valley Ct. address in Fairborn, beginning in March of 2009 and continuing through at least May of 2011. (Anzalone Dep. 137-38, Ex. I.) O'Reilly testified that he did not ask Chad Nabors about receiving the credit card invoices because he did not determine that he needed to ask. (O'Reilly 10/9/2014 Dep. 93.) When asked why he would not have asked Chad Nabors about the invoices, O'Reilly testified, "I don't have an answer." (Id.)

In addition to the letters and email communications, the customer service log indicates that JPMorgan contacted Chad Nabors by telephone at least twice. (Id. at 105, Ex. R.) The customer service log indicates that a representative of Chase spoke with Chad Nabors on April 16, 2010, and on April 18, 2011. (Id.) The log indicates that, both times, the Chase representative confirmed Chad Nabors' social security number, mailing address and email address, among other information. There is no indication on the customer service log that Chad Nabors was claiming that the student loan was fraudulently made. (Id.)

By comparing handwriting samples, O'Reilly concluded that Walker engaged in fraudulent conduct in connection with the student loan. (Id. at 48-49, 171-72.) Chad Nabors had alleged that Walker obtained a student loan without his knowledge. (Id. at 71-72.) O'Reilly

compared handwriting samples from Walker and from Chad Nabors. (Affidavit of Kelly O'Reilly

("O'Reilly Aff.) ¶ 6 Feb. 3, 2015.) He used Walker's handwriting from her handwritten

statement, her signature on the deposit slip depositing the student loan check into Walker's

checking account, and her signature from her bank signature card. (Id. at ¶ 7.) He used Chad

Nabors' handwriting from his forgery affidavit, his driver's license, his handwritten statement to

the police and his signature samples. (Id. at ¶ 8.) After comparing these handwriting samples,

O'Reilly concluded that there were favorable similarities between Walker's handwriting and the

handwriting on Chad Nabors' student loan application, Chad Nabors' checking account personal

signature card and the endorsement on the back of the student loan check. (Id. at ¶ 9.)

In addition to his own assessment, O'Reilly sought the opinion of another GS&I

investigator, Jane Woodland, who had experience with handwriting analysis. (O'Reilly 10/9/14

Dep. 67-68.) Jane Woodland determined that the handwriting and the endorsement on the back of

the student loan check was very similar to the handwriting on the depository account signature

card and also matched handwriting associated with Walker's handwritten statement and interview

acknowledgment form and other documents. (Id. at 68.)

O'Reilly determined that Walker had signed Chad Nabors' name on the loan check, on the

checking account signature card, on the student loan application and on the bank signature card.

(Id. at 69-70.) Although he did not know if Chad Nabors and Shannon Nabors were complicit, he

concluded that Walker was complicit. (Id. 171-72.) Walker prepared a case summary and

provided it, along with Walker's statement to HR. (Id. at 31.)

On October 14, 2011, O'Reilly, Cherie Niswonger (Human Resources Business Partner),

Cliff Hemmert (Market Manager) and John Anzalone (District Manager) participated in a

telephone call to discuss O'Reilly's findings. (Id. at 40.) During this call, O'Reilly presented his

findings and his conclusion that Walker was likely involved in making a fraudulent student loan application in the name of Chad Nabors. (Id. at 48.) O'Reilly indicated that Walker received the benefits of the student loan, that some of the documents that are represented as Chad Nabors' handwriting are more closely related to Walker's handwriting, that another investigator had looked at the handwriting samples as well, that Walker acknowledged using Chad Nabors' credit card without being an authorized user or signer and that the addresses on the various documents did not correlate with independent research. (Id. at 49.)

During the call, O'Reilly, Niswonger, Hemmert and Anzalone compared a number of handwriting samples to determine if Chad Nabors' signature had been forged on the Student Loan Application. (Niswonger Dep. 92; Anzalone Dep. 152-53; Deposition of Cliff Hemmert ("Hemmert Dep.") 88-90 Nov. 11, 2104.) After reviewing the handwriting samples, all three determined that Walker forged Chad Nabors' signature on the Student Loan Application. (Niswonger Dep. 92, Hemmert Dep. 90; Anzalone Dep. 98.) Niswonger also concluded that Walker's denial of wrongdoing lacked credibility and that Walker was aware that someone was defrauding Chase and she benefitted from it and did not report it. (Niswonger Dep. 114.) They then decided that it was appropriate to terminate Walker's employment. (Niswonger Dep. 15-16; Hemmert Dep. 69.)

Borton was not involved in the decision to terminate Walker's employment. (Borton Dep. 30-31.) However, Borton did discuss Walker's performance with Anzalone before Walker returned from FMLA leave (id. 45), and Anzalone was one of the decisionmakers (Anzalone Dep.98).

Walker's personnel file was not reviewed before the decision to terminate her employment was made. (Niswonger Dep. 26.) Further, neither Niswonger nor Hemmert were aware that Walker had taken FMLA leave. (Niswonger Dep. 141; Hemmert Dep. 96.)

After the decision to terminate Walker's employment was made, Anzalone and Niswonger drafted a Recommendation for Termination ("RFT"). (Niswonger Dep. 96.) The RFT recommends that Walker be terminated "because of misconduct, specifically for the falsification of bank documents." (Id. Ex. RR.) The RFT describes the findings, in relevant part, as a determination that there were similarities to Walker's handwriting and the signature on Chad Nabors' Student Loan Application, the endorsement on the deposited check and his signature card and that Chad Nabors did not sign any of these documents. (Id.)

Anzalone then met with Walker at the Eaton Branch and informed her that, based upon the investigation of Chad Nabor's complaint, JPMorgan had decided to terminate her employment. (Walker 8/7/2014 Dep. 177.) Anzalone offered no other specific reason for the termination. (Id. at 178.) No one ever told Walker that her employment at JPMorgan was terminated specifically because she took FMLA leave or because of her gender. (Walker 8/7/14 Dep. 185, Deposition of April Walker ("Walker 12/11/14 Dep.") 294 Dec. 11, 2014.)

### Walker's Replacement

After the termination of Walker's employment, JPMorgan replaced her as the Branch Manager of the Eaton Branch with Justin Kozuszek ("Kozuscek").  (Anzalone Dep. 23.) During his time as Branch Manager, Kozuscek was involved in three incidents that were investigated by JPMorgan.

In April of 2013, an Eaton Branch Personal Banker alleged that Kozuscek used the Personal Banker's log-in information to conduct maintenance on Kozuscek's and his wife's joint

bank account without proper authorization and in violation of JPMorgan's policy. Deposition of Kelly O'Reilly ("O'Reilly 12/11/14 Dep.") 10-11 Dec. 11, 2014.) JPMorgan conducted an investigation, including reviewing surveillance tapes and computer forensics, and found that there was insufficient evidence to conclude that Kozuszek did anything wrong. (Anzalone Dep. 43; Niswonger Dep. 35, O'Reilly 12/11/14 Dep. 13.)

In December of 2013, Kozuszek was involved in another incident. (O'Reilly 12/11/14 Dep. 25-28.) Kozuszek, as the Branch Manager, approved the removal of a file cabinet from the Eaton Branch by a third party despite the fact that the file cabinet contained confidential client files. (Id.) GS&I closed this case because no data breach had been verified. (Id. at 23-24.) GS&I referred this case to Anzalone and HR to determine if any corrective action was necessary. (Id. at 26.) As a result, Kozuszek received verbal coaching from Anzalone and was instructed that, as Branch Manager, it was his obligation to check the filing cabinet to ensure that it was empty before it left bank premises. (Affidavit of Cherie Niswonger ("Niswonger Aff.") ¶ 5, Ex. 32 Jan. 30, 2015.)

A third incident involving Kozuszek occurred in August of 2014 and concerned allegations that he instructed an Eaton Branch Bank Teller to falsify bank documentation by adjusting her cash totals and that he had harassed this Bank Teller. (O'Reilly 12/11/14 Dep. 31; Niswonger Aff. ¶ 6, Ex. 33.) Bank policy required the Branch Manager to recount a cash drawer if it was off by more than $100 at the end of the shift. (Niswonger Aff. ¶ 6, Ex. 33.) Kozuszek allegedly added funds to the Bank Teller's drawer such that the difference was less than $100. (Id.) A GS&I investigator concluded that Kozuszek had falsified records by adding money to the cash drawer. (O'Reilly 12/11/14 Dep. 31-32.) Kozuszek resigned his employment during this investigation which was subsequently recoded as misconduct. (Id. at 33.) Finally, JPMorgan's

practice is to terminate an employee when the employee is found to have engaged in misconduct. (Niswonger Aff. ¶ 7.)

## RELEVANT LEGAL STANDARDS

### Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, and its associated caselaw, establishes the standard of review for summary judgment. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson*, 477 U.S. at 250).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go

-17-

beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id*. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id*.

Finally, in ruling on a motion for summary judgment, "[a] district court is not... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

### FMLA Retaliation and Ohio Gender Discrimination Claims

A plaintiff may establish a violation of the FMLA and/or gender discrimination by either direct or circumstantial evidence. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009).

Direct evidence of illegal discrimination is evidence which, if believed, would require the conclusion that unlawful discrimination was at least a motivating factor. *Id.* If a plaintiff does not have direct evidence of discrimination, the FMLA retaliation claim and the gender discrimination claim brought pursuant to Ohio law are analyzed using the *McDonnell Douglas* burden-shifting framework. *Fields v. Fairfield County Board of Developmental Disabilities,* 507 F. App'x 549, 554 (6th Cir. 2012); *Graham v. Best Buy Stores, L.P.*, 298 F. App'x 487, 493 (6th Cir. 2008); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1115 (6th Cir. 2001).

In this case, Walker does not identify direct evidence of either FMLA retaliation or gender discrimination. Therefore, her claims are analyzed using the *McDonnell Douglas* burden-shifting framework.

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must first establish a prima facie case. *Fields*, 507 F. App'x at 554(citing *Back v. Nestle USA, Inc.*, 694 F.3d 571, 576 (6th Cir. 2012)). The burden then shifts to the defendant to offer sufficient evidence of a legitimate, nondiscriminatory reason for taking its action. *Id.* The burden then shifts back to the plaintiff to show that the defendant's legitimate, nondiscriminatory reason is a pretext for discrimination. *Id.* Finally, on a motion for summary judgment, such as this, a district court considers whether there is sufficient evidence to create a genuine issue of material fact at each stage of the *McDonnell Douglas* framework. *Id.*

A plaintiff may show that the legitimate non-discriminatory reason given by the employer is a pretext for discrimination by showing that the reason given (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Clay v. United Parcel Service*, 501 F.3d 695, 704 (6th Cir. 2007)(citing *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). A reason cannot be a pretext for

discrimination unless it is shown that the reason is both false and that discrimination was the real reason. *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)(citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)). An employee may not rely upon her or his prima facie evidence to show pretext, but must, instead, introduce additional evidence of discrimination. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger*, 579 F.3d 614. Finally, consideration of pretext focuses on the defendant's beliefs and not on the plaintiff's own perceptions. *Scott v. Thomas & King, Inc.*, No. 3:09-CV-147, 2010 WL 2630166 at *8 (S.D. Ohio June 28, 2010).

The elements of a prima facie claim of FMLA retaliation are: (1) engagement in an activity protected by the FMLA; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Fields*, 507 F. App'x at 555(citing *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007)). The elements of a prima face claim of gender discrimination are: (1) a member of a protected class; (2) an adverse employment action; (3) qualified for the position; and (4) replacement by someone outside the protected class or treated differently than similarly-situated employees outside the protected class. *Hale v. Mercy Health Partners*, 20 F. Supp.3d 620, 630 (S.D. Ohio 2014).

## ANALYSIS OF SUMMARY JUDGMENT MOTION

JPMorgan has moved for summary judgment on both of Walker's claims. Each will be addressed seriatim using the *McDonnell Douglas* framework.

### FMLA Retaliation

### Prima Facie Claim

Walker must first establish a prima facie case of FMLA Retaliation. There is Rule 56 evidence that satisfies two of the three elements of a prima facie claim of FMLA Retaliation.

Walker took FMLA leave from May through August of 2011, an activity protected by the FMLA. Also, Walker's employment was terminated in October of 2011, an adverse employment action. Whether Walker can establish a prima face case of FMLA retaliation turns, then, on whether there is a causal connection between Walker taking FMLA leave and the termination of her employment.

JPMorgan argues that there is no evidence that ties Walker's FMLA leave to the termination of her employment. Walker argues that there is.

The Sixth Circuit has determined that a proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection. *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007)(finding sufficient evidence of a causal connection where employer terminated plaintiff three months after requesting leave and there was other evidence of employer animosity regarding the leave taking). In this case there is Rule 56 evidence that there was two months between the protected activity and the adverse employment action and there is other evidence of causal connection.

There is Rule 56 evidence suggesting that JPMorgan supervisors expressed what could be considered animosity toward FMLA leave and Walker's taking of her FMLA leave. The behavior of Walker's supervisors led her to believe that her job was in jeopardy, a concern that she expressed to Willis in the HR Department before the termination of her employment.

In sum, there is Rule 56 evidence from which a reasonable juror could conclude that there was a causal connection between Walker's FMLA leave and the termination of her employment. Given that a plaintiff's burden to establish a prima facie case is not onerous (id.), Walker has done so.

**Legitimate, Nondiscriminatory Reason**

The burden next shifts to JPMorgan to produce evidence of a legitimate, nondiscriminatory reason for terminating Walker's employment. JPMorgan states in its Motion for Summary Judgment that Walker was terminated "for engaging in fraudulent conduct by securing a student loan in Chad Nabors' name and then depositing the student loan proceeds into her own personal bank account to be used for her own, non-education related purposes." This, if accurate, is a legitimate, non-discriminatory reason. The burden then shifts to Walker to show that JPMorgan's legitimate, nondiscriminatory reason was a pretext for FMLA retaliation.

### Pretext

Walker can show pretext by presenting evidence that the reason given has no basis in fact, did not actually motivate the termination of her employment by JPMorgan or was insufficient to warrant the termination of Walker's employment. Walker responds by arguing that JPMorgan's given reason has no basis in fact and by arguing that JPMorgan's shifting justification creates additional evidence of pretext. Each of Walker's arguments will be addressed seriatim.

#### No Basis In Fact

Walker first argues that Chad Nabors eventually acknowledged that he did authorize Walker to open the checking account. Chad Nabors' acknowledgment in August of 2011, that he authorized Walker to open the checking account for him is contained in an email from O'Reilly to Niswonger on October 14, 2014. (Anzalone Dep. 117-20, Ex. F.) Therefore, there is, at a minimum, a question of fact as to whether Chad Nabors authorized Walker to open the checking account in his name.

Walker next argues that Chad Nabors' allegation that Walker opened a credit card in his name without his knowledge or consent is false. There is Rule 56 evidence that JPMorgan (Chase) sent monthly credit card invoices to Chad Nabors' home address beginning in early 2009 when the

credit card was opened. Therefore, there is Rule 56 evidence that, at a minimum, indicates that Chad Nabors may have had knowledge that a credit card had been opened in his name long before he made the complaint at issue in this case.

Walker next argues that Chad Nabors' allegation that Walker forged his signature and secured a student loan without his knowledge is false. There is Rule 56 evidence that student loan proceeds were presumably mailed to Chad Nabors's address at 643 Hudson Valley Ct. Further, there is Rule 56 evidence that JPMorgan's (Chase's) deferment quarterly interest letters were mailed to Chad Nabors' address at 643 Hudson Valley Ct. Also, there is Rule 56 evidence that JPMorgan had research that indicated that Walker did not reside at 643 Hidden Valley Ct. during this time period. Finally, there is Rule 56 evidence that Chad Nabors alleged that Walker secured his student loan in 2008 by obtaining his personal information when his checking account was opened later, in 2009.

Walker's final argument on this issue is that this Court should reject JPMorgan's invocation of the "honest belief" rule. Under the Sixth Circuit's "honest belief" rule, an employer may avoid a finding that its claimed legitimate, non-discriminatory reason is a pretext for discrimination if the employer establishes that it reasonably relied upon the particularized facts that were before it at the time the decision was made. *Brooks v. Davey Tree Expert Company*, 478 F. App'x 934, 943 (6th Cir. 2012.) However, if the employee produces sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision, the employer's decisional process may be "unworthy of credence" and any reliance on such a process is not honestly held. *Id.*

In this case, there is some Rule 56 evidence that indicates that JPMorgan's decision to terminate Walker's employment may be unworthy of credence. For example, there is no Rule 56

evidence that JPMorgan followed up on evidence that Chad Nabors may not have been truthful when he complained. Further, there is no Rule 56 evidence that JPMorgan fully followed up on Walker's statements. Finally, there is Rule 56 evidence that O'Reilly repeatedly admitted that certain conclusions about the investigation would be "speculation" on his part. (O'Reilly Dep. 104, 115, 121, 142.) Thus, there are genuine issues of material facts as to whether JPMorgan can invoke the "honest belief" rule.

Shifting Justification

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)(quoting *Thurman v. Yellow Freight Systems*, 90 F.3d 1160, 1167 (6th Cir. 1996)). In the RFT, which is the only available Rule 56 evidence regarding the reasons for discharge created at the time of discharge, JPMorgan indicates that the reason for termination is the "falsification of bank documents." (Niswonger Dep. 96, Ex. RR.) JPMorgan now says the reason for termination is for engaging in fraudulent conduct by securing a student loan in Chad Nabors' name and then depositing the student loan proceeds into her own personal bank account to be used for her own, non-education related purposes. The RFT discusses the belief that Walker falsified bank documents and it discusses these bank documents, including the deposit of the student loan proceeds.

The allegation in JPMorgan's Motion for Summary Judgment that Walker's employment was terminated because, among other things, she deposited the student loan proceeds into her own personal bank account is found in the RFT.

However, nothing is said in the RFT about the use of the student loan proceeds. According to the RFT, the reasons for terminating Walker's employment did not include a use of the student

-24-

loan proceeds. However, JPMorgan now says Walker's employment was terminated for, among other things, using the student loan proceeds "for her own, non-education related purposes." Further, none of the decisionmakers could recall discussing any rationale for terminating Walker's employment other than her alleged forgery. (Anzalone Dep. 218, Niswonger Dep. 90-92, Hemmert Dep. 86-91, 94, 100). Therefore, JPMorgan's reasons for terminating Walker's employment have expanded since her employment was terminated.

Conclusion on Pretext

There are genuine issues of material fact as to whether JPMorgan's legitimate, nondiscriminatory reason for terminating Walker's employment had no basis in fact. Further evidence of pretext is JPMorgan's changing rationale for terminating Walker's employment.

**Conclusion On FMLA Retaliation Claim**

Walker has established a prima facie case of FMLA retaliation. And, there are genuine issues of material fact as to whether Walker has shown that the termination of her employment by JPMorgan was a pretext for FMLA retaliation. Therefore, JPMorgan is not entitled to summary judgment on Walker's FMLA retaliation claim.

**<u>Gender Discrimination</u>**

Walker must first establish a prima facie case of gender discrimination. In this case, JPMorgan concedes for purposes of summary judgment, that Walker has demonstrated a prima facie case. Walker is a female and thus a member of a protected class. JPMorgan took an adverse employment action against Walker by terminating her employment. There is no evidence that Walker was not qualified to be the Branch Manager of the Eaton Branch. Finally, Walker was replaced by Kozuszek, a male and, thus, not a member of the protected class.

**Legitimate, Nondiscriminatory Reason**

-25-

JPMorgan states in its Motion for Summary Judgment that Walker was terminated "for engaging in fraudulent conduct by securing a student loan in Chad Nabors' name and then depositing the student loan proceeds into her own personal bank account to be used for her own, non-education related purposes." This, if accurate, is a legitimate, non-discriminatory reason. The burden then shifts to Walker to show that JPMorgan's legitimate, nondiscriminatory reason was a pretext for gender discrimination.

## Pretext

Walker can show pretext by presenting evidence that the reason given has no basis in fact, did not actually motivate the termination of her employment by JPMorgan or was insufficient to warrant the termination of Walker's employment. Walker responds by arguing that the same evidence that supports a finding of pretext regarding her FMLA claim supports a finding for her gender discrimination claim. In addition, Walker argues that she was similarly situated to Kozuszek and that Kozuszek received different treatment from JPMorgan for committing an offense similar to the offense that JPMorgan thought she committed.

First, the evidence that supports a finding of pretext regarding Walker's FMLA claim does not apply to her gender discrimination. While temporal proximity may apply to both claims, the other evidence does not. The other evidence regarding Walker's FMLA claim involves JPMorgan's alleged treatment of her regarding the taking of FMLA leave and the investigation of Chad Nabor's complaint, neither of which are remotely related to her gender. Finally, neither of JPMorgan's alleged legitimate, nondiscriminatory reasons involve Walker's gender, so shifting justification cannot be used to show pretext for Walker's gender discrimination claim.

Walker's other argument regarding pretext is that she was similarly situated to Kozuszek and was treated differently. Specifically, Kozuszek committed a terminable offense and was not

terminated. The terminable offense cited by Walker occurred when Kozuszek used JPMorgan's computer to make changes to Kozuszek's wife's bank account. After its investigation of this matter, JPMorgan determined that it lacked sufficient evidence and did not discipline Kozuszek.

This argument is without merit. Walker has identified no evidence that JPMorgan did not fully investigate the incident. Therefore, there is no evidence that Kozuszek should have been disciplined and was not. As a result, this incident is not evidence that Walker was treated differently.

Walker has not met her burden of identifying evidence of pretext. Therefore, her gender discrimination claim must fail. There are no genuine issues of material fact and JPMorgan is granted summary judgment on Walker's gender discrimination claim.

<u>**Conclusion On Summary Judgment Motion**</u>

Walker has brought two claims, one for FMLA retaliation and one for gender discrimination. There are genuine issues of material fact regarding Walker's FMLA retaliation claim. There are no genuine issues of material fact regarding Walker's gender discrimination claim. Therefore, JPMorgan's Motion for Summary Judgment (doc. #43) is GRANTED IN PART and OVERRULED IN PART. Walker's FMLA retaliation claim remains to be adjudicated.

**MOTION TO STRIKE**

Following the filing of JPMorgan's Motion for Summary Judgment, Walker's Response and JPMorgan's Reply, Walker filed a Motion To Strike Defendant's "Reply Exhibit 4" In Support of Its Motion for Summary Judgment for Exceeding the 20-Page Limit. (Doc. #50) Although this Motion is not fully briefed, the Court is able to address it since it relates to the above Motion for Summary Judgment.

Walker argues that JPMorgan has violated the Court's rule limiting motions to twenty pages, General Order No. Day 12-01,  by attaching to its Reply Brief a single-spaced, 11-page memorandum of law that it labeled as an "exhibit."[1] JPMorgan's Reply Brief, excluding the Certificate of Service, is twenty (20) pages long. Attached to this Reply Brief is Reply Exhibit 4 which is eleven (11) pages long. Reply Exhibit 4 appears to be JPMorgan's argument regarding the validity of various evidence identified by Walker.

Reply Exhibit 4 includes argument in addition to that found in the Reply Brief. As such, Reply Exhibit 4, when counted with the Reply, exceeds the twenty (20) page limitation. However, this additional-page argument is irrelevant. It is irrelevant because the Court is perfectly capable of determining for itself which evidence to use for Rule 56 matters.

Because it was irrelevant and, rather than needlessly prolonging this litigation, the Court now considers Walker's Motion To Strike moot. Walker's Motion To Strike Defendant's "Reply Exhibit 4" In Support of Its Motion for Summary Judgment for Exceeding the 20-Page Limit. (Doc. #50) is OVERRULED as being moot.

**DONE and ORDERED** in Dayton, Ohio, this Thirteenth Day of April, 2015.

**s/Thomas M. Rose**

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of record

---

[1] The Court notes that JPMorgan sought an extension to the length of its Motion for Summary Judgment from twenty (20) to forty (40) pages. The Court granted an extension to a total of thirty (30) pages.